IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

EDGAR JAMAL GAMORY, aka J.B., and VAUGHN GREENE, aka Smooth,

Defendants.

CRIMINAL CASE NO.

1:08-CR-153-TWT-RGV

## ORDER FOR SERVICE OF MAGISTRATE JUDGE'S FINAL REPORT, RECOMMENDATION, AND ORDER

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Cr. R. 58.1(A)(3)(a) and (b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within ten (10) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the Report and Recommendation may be

adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced ten (10) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.**  The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this 27th day of February, 2009.


RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. |
| EDGAR JAMAL GAMORY, aka J.B., and VAUGHN GREENE, aka Smooth, | 1:08-CR-153-TWT-RGV |
| Defendants. | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER ON DEFENDANTS' PRETRIAL MOTIONS

Defendants Edgar Jamal Gamory ("Gamory") and Vaughn Greene ("Greene") (collectively, "defendants"), along with two other co-defendants,[1] are charged with conspiring to distribute and possess with intent to distribute cocaine and marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(ii) and (vii), and Gamory is also charged with four counts of money laundering in violation of 18 U.S.C. §§ 1957 and 2. [Doc. 34]. Gamory and Greene filed motions to suppress evidence, [Docs. 54, 61, 78], which the government opposed in a consolidated response, [Doc. 83]. The

---

[1] Co-defendant Edmond Gamory has filed no pre-trial motions, and co-defendant Victor Olvera entered a plea of guilty on September 3, 2008, [Doc. 84], so his pre-trial motions, [Docs. 70, 73], are **DENIED** as abandoned. Greene has also moved to adopt co-defendant Gamory's memorandum of law, [Doc. 88], and his motion to adopt is **GRANTED** as unopposed.

Court conducted an evidentiary hearing on Greene's motion to suppress on October 21, 2008,[2] and after being granted an extension of time, the parties filed post-hearing briefs regarding Greene's motion, [Docs. 122, 123]. Having considered the motions and the parties' briefs, the undersigned **RECOMMENDS** that the motions to suppress, [Docs. 54, 61, 78], be **DENIED**.

## I. STATEMENT OF FACTS

In July 2006, Special Agent Laci Larsen ("Agent Larsen") of the Atlanta Field Office of the Drug Enforcement Administration ("DEA"), began an investigation of co-defendant Victor Olvera ("Olvera"). (Tr. at 158). During the course of the investigation, Agent Larsen identified other subjects, initially known only by their nicknames as J.B., Smooth, and Pudge. (Id.). In April 2007, agents secured the cooperation of a confidential informant ("CI") by offering to help him gain legal status in the United States and to pay him if his information was "deemed to be good." (Id.). The CI provided information on a Mexican drug trafficker, Enrique Juangorena ("Juangorena"), who the CI said had been providing cocaine and marijuana to J.B., later identified as Gamory. (Tr. at 162). The CI also identified

---

[2] See Doc. 117 for a transcript of the evidentiary hearing. The transcript page numbers do not correspond to the assigned CM/ECF page numbers, so the citations to the evidentiary hearing transcript will refer to the CM/ECF page number and will be cited hereinafter as "(Tr. at ___)." In addition, the government submitted exhibits at the October 21, 2008, hearing, which will be referred to as "(Gov. Ex. ___)."

Smooth, who was later determined to be Greene, as an associate of J.B. The CI knew that Smooth would "help drive money," [Tr. at 166], and he had seen Smooth at J.B.'s residence on an occasion when drug proceeds were picked up. (Tr. at 184). Smooth had provided money to the CI at some point, but the CI had not seen him at a drug transaction where drugs were being exchanged. (Tr. at 184, 186).

On or about May 22, 2007, the CI traveled with agents to identify locations utilized by the drug organization. The CI identified a residence located at 4751 Riverwalk Trail, Lilburn, Georgia, and a recording studio located at 680 Lauren Parkway, Stone Mountain, Georgia, as locations used by Gamory. (Tr. at 162). While driving by the Riverwalk residence that day, agents observed a dark colored Ford Explorer parked in the driveway. (Tr. at 164). Upon seeing the Ford Explorer, the CI informed the agents that Gamory used Ford Explorers to transport narcotics to and from New York, Virginia, and other places. (Id.). The CI had seen a compartment opened up in a Ford Explorer used by Gamory, (Tr. at 204), but it had been a long time since the CI had seen a Ford Explorer at the residence. (Tr. at 202).[3]

On or about May 23, 2007, Juangorena contacted the CI and told him that he had a load of cocaine in the Atlanta area, and he asked the CI to contact J.B.

---

[3] The CI also knew that Gamory used out-of-state license tags, and the Ford Explorer parked in Gamory's driveway on that day had a North Carolina tag. (Tr. at 202).

(Gamory) to see if he was interested in purchasing any of it. (Tr. at 164-66). Juangorena quoted the CI a price of $17,500 per kilogram. (Tr. at 166). The CI contacted Gamory, who agreed to purchase 35 kilos of cocaine, and they agreed to meet at the recording studio on Lauren Parkway the next day to conduct the transaction. (Tr. at 166-68).

On May 24, 2007, agents established surveillance at Gamory's Riverwalk Trail residence and the Lauren Parkway recording studio, where the meeting with Gamory was supposed to take place. (Tr. at 56-58, 168). On that day, the CI, who was wearing a recording and transmitting device, picked up Juangorena at his hotel room and drove him to the recording studio. (Tr. at 168). When they arrived, the CI contacted Gamory and told him they were at the studio. Gamory told the CI he would be there within a few minutes, and Gamory asked "if he needed to bring the tickets or if they were just going to talk." (Tr. at 170). Agents understood from the context of the conversation as well as from their training and experience that "tickets" was a reference to the money for the drugs. (Tr. at 168-70). The CI responded that they were just going to talk. (Tr. at 170).

Within a few minutes of the CI's conversation with Gamory, agents conducting surveillance of Gamory's residence observed an individual, later identified as Greene, arrive at the residence in a blue Infinity. (Tr. at 100). Greene

entered the residence carrying a backpack, and a short time later, he and another individual exited the residence. (Tr. at 170). Greene, carrying the same backpack, entered a Ford Explorer parked at the residence; the other individual, later determined to be Gamory, entered another vehicle, and the two vehicles left the residence in tandem, with the Ford Explorer following the other car. (Tr. at 172, 188). Surveillance agents followed the vehicles, and one agent pulled in directly behind the Ford Explorer as the vehicles were leaving the subdivision. (Tr. at 114). When the Ford Explorer and the other vehicle reached Highway 78, they turned in different directions. (Tr. at 172). The Ford Explorer headed toward the predetermined meet location of the recording studio, and the other vehicle went in the opposite direction. (Tr. at 100-01, 172).

The surveillance agents decided to follow the Ford Explorer, which began driving in an erratic manner, as if conducting a "heat check" to see if it was being followed. (Tr. at 104, 172). The CI received a call from Gamory who said that "something was wrong and he was not coming," and the Ford Explorer subsequently changed its course. (Tr. at 172-74). DEA Special Agent Keith Cromer ("Agent Cromer"), who had been conducting surveillance at the recording studio, left that location to assist other agents in following the Ford Explorer, which began traveling at a high rate of speed away from the area and eventually reached the

Wesley Providence Apartment complex off of Klondike Road in Lithonia, Georgia. (Tr. at 57-58, 104, 114-15).

Agents following the Ford Explorer informed Agent Cromer that the vehicle had pulled into a garage located at the back of the apartment building. (Tr. at 58). Agents observed an African-American male fitting the description of the individual believed to have been driving the Ford Explorer walking through a breezeway toward a group of individuals at the mailboxes in front of the apartment complex. (Tr. at 58, 60). As agents approached the African-American male, later identified as Greene, he threw down a set of car keys and attempted to flee. (Tr. at 62, 180); [Doc. 78-2 ¶ 26]. By the time Agent Cromer arrived on the scene, Greene had been apprehended and handcuffed. (Tr. at 62). Agent Cromer asked Greene if he was okay, told him the agents were with the DEA, placed Greene in his vehicle, and moved to an area "deemed as secure for [the agents]," which was toward the back side of the apartments near the garage the Ford Explorer had entered. (Tr. at 62, 64). After Agent Cromer read Greene his Miranda[4] warnings, Greene chose not to make any statements. (Tr. at 64). Agent Cromer activated the alarm on the keys Greene threw down to confirm which garage the Ford Explorer had entered. (Tr. at 64-66). Agents then proceeded to the apartment complex leasing office to determine which

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

apartment was associated with that garage. Agents learned that Lakisha Parker ("Parker"), the occupant of unit 6301, had rented the garage where the Ford Explorer was parked, so the agents went to unit 6301 to request consent to search the garage. (Tr. at 122-24).

Agent Cromer knocked on the apartment door and spoke to Parker, who was Greene's "on and off" girlfriend. (Tr. at 24, 68). Agent Cromer testified that Parker was fine when she answered the door, but "a little apprehensive." (Tr. at 72). Agent Cromer informed her that he was with the DEA and asked if agents could come in and speak with her.[5] (Tr. at 68). Parker allowed Cromer into the apartment's foyer area, and he asked if anyone else was in the apartment and inquired whether the agents could do a cursory search of the apartment"to make sure no one else [was] . . . in the apartment at that time." (Tr. at 68, 70). Parker informed Agent Cromer that only she and her daughter were in the apartment, but she agreed to allow a cursory inspection. (Tr. at 68).

Agent Cromer entered the residence, and as other agents began to enter to conduct the cursory inspection, Parker told Agent Cromer that she just wanted him to come in. (Tr. at 70). Agent Cromer explained that he could not come in by

---

[5] The agents were wearing street clothes and protective vests identifying themselves as law enforcement. The agents' weapons were not drawn as they approached the apartment. (Tr. at 66-68, 348).

himself because a witness would be needed, so she allowed Agent Cromer, his supervisor, Special Agent Robert Murphy ("Agent Murphy"), and Special Agent Spring Williams ("Agent Williams") to enter the apartment, and they closed the door while the other agents remained outside. (Tr. at 70, 136). Agent Murphy also testified that Parker "only wanted a couple of [agents] in," and allowed Agent Cromer , Agent Williams, and himself to enter the residence. (Tr. at 348). Agents Murphy and Williams did a cursory search of the apartment for safety reasons and found no one else. (Tr. at 70, 368-70). Agent Cromer testified that "no one went into any drawers" and that they only "looked in a place where a person would be and that would be under a bed and inside of a closet." (Tr. at 128-29).[6]

Parker, on the other hand, testified at the hearing that initially she heard "a whole bunch of people like running up the steps at one time," and that when she looked out the window, she saw that the "shirts said DEA and all that," and saw that some of the agents were wearing black masks. (Tr. at 216, 226, 260). Parker stated that she gave permission only to Agent Williams to enter her residence because she was female, and that Agent Williams did enter by herself, but that the "whole task force came in right like eventually behind her." (Tr. at 218, 254). Parker testified that she told the other officers to get out, but that they started lifting up

---

[6] No evidence was recovered from the apartment. (Tr. at 176).

mattresses and looking in drawers and the washer and dryer. (Tr. at 220). The agents allegedly left after Parker told them to get out. (Id.). Parker testified that she told the agents they needed a search warrant and that they all told her different things, including that they would knock her door down. (Tr. at 222). Parker also testified that she told the agents they needed a search warrant to search the garage. (Tr. at 224). However, Agent Murphy testified that Parker never mentioned the word "search warrant." (Tr. at 360).

Agent Cromer testified that after they completed the cursory search, he and Agent Murphy began asking Parker about Greene, and she became "very nasty" and questioned whether they were actually law enforcement agents. (Tr. at 74-76, 132). Parker said she was going to call the police, and the agents told her she could do so if it would make her feel better. (Tr. at 74-75; Gov. Ex. 2). While Parker was on the phone with the 911 operator, the agents questioned her about Greene. (Tr. at 78). After Parker finished talking to the 911 operator, she called her mother. (Tr. at 79-80). Parker's mother testified that Parker told her that there were "some people in my house, I don't know who they [are], they won't get out of my house." (Tr. at 318).[7] Parker's mother also recalled that Parker told her that during the 911 call, one

---

[7] Agent Cromer, who was standing next to Parker during this telephone conversation, testified that Parker's mother asked Parker if she believed who the agents said they were, and that she said yes. (Tr. at 80).

of the agents was in Parker's bedroom, one was in the bathroom, and one was in Parker's daughter's bedroom. (Tr. at 328). Parker's mother further testified that she spoke to an agent on the phone who was "very rude" and said that they did not need a warrant. (Tr. at 313-14, 326). After this conversation, Parker's mother drove to Parker's residence because her daughter sounded scared and upset. (Tr. at 314-15).

Parker could not remember whether she called 911 before or after calling her mother, but she testified that she told the 911 operator that after she told the agents to leave, "they were still trying to break into [her] house," and that she wanted a police officer to "make them leave or whatever or they need to go get a search warrant." (Tr. at 224, 250). Parker indicated that she called 911 after she had made the agents leave her apartment, that the agents kept knocking on her door after she made the call, and that she only opened the door upon her mother's arrival. (Tr. at 226, 228).

Agent Cromer testified that after Parker hung up with her mother, she calmed down and sat down on the sofa with him, and he questioned her about Greene and the Ford Explorer. Parker told him that Greene had spent the night at her apartment the night before, had taken her blue Infinity G35, but had returned to her apartment at some point before the agents arrived, and had gotten into an argument with her

before leaving again.  (Tr. at 82, 84).  Parker did not know anything about the Ford

Explorer parked in the garage and did not have remote control access to the garage

because it was programmed into her Infinity.  (Tr. at 84, 86).  However, Agent

Cromer testified that Parker gave the agents consent to search the garage and

provided him with keys to the side door of the garage which he gave to another

agent who walked down to the garage.[8]  (Tr. at 84, 86-88).  Agent Cromer, Agent

Williams, and Parker walked around the front of the apartment and then "outside

the door as well as into the breezeway," and continued to talk.  (Tr. at 86).  Parker

then informed the agents that the keys she had provided would not work because

the lock on the door had been changed.  (Tr. at 86-88, 356, 362, 376).[9]

Other agents then contacted the apartment management to see if they had a

key to the garage.  (Tr. at 88).  As Agent Cromer, Agent Williams, and Parker were

standing outside her apartment on a terrace overlooking the parking lot, the

---

[8] Parker denied giving the agents any keys and testified that after her mother arrived, she left her apartment with her mother and went down toward the garage where agents continued to ask her for keys to the garage.  (Tr. at 228, 230).  Parker testified that she continued to tell them "go get a search warrant,"  (Tr. at 230, 278), and that she never gave the agents a key to the garage because she had just gotten her locks changed, (Tr. at 232, 280).  However, Parker's mother testified that when she got to the apartment complex, the agents had already gotten into the garage. (Tr. at 316, 332).

[9] Agent Murphy testified that Parker handed him some keys after they asked her if she had keys or access to the garage, but that she "wasn't sure if [they] opened it or not" because the "locks had been changed."  (Tr. at 356).

apartment manager, Melissa Moyer ("Moyer"), came down to the parking lot with members of her staff, carrying a set of keys. (Tr. at 88). Agent Cromer testified that as Parker saw Moyer, Parker "went ballistic" and started screaming and cursing at the staff. (Tr. at 88, 138-40). Moyer testified that she gave the keys to Parker and told her, "You don't have to give them to them, I'm giving them to you." (Tr. at 232). Moyer further testified that Parker asked why Moyer and her staff were there, and that Moyer explained to her that she had to be there but she would give Parker the keys to the garage and let her decide what to do with them. (Tr. at 296-98).

According to Parker, when Moyer came to the garage with a set of keys, Moyer "tossed" the keys toward her but an FBI agent caught them and "ran over there to the garage." (Tr. at 232, 280). However, Moyer testified that Parker told her that she did not want the key, but that she did "take the key and then she proceeded to walk away." (Tr. at 298). Moyer also testified that one of the agents said to Parker, "'Come on just give us the key, it's the right thing to do,'" but that Parker began crying, took the key, and "just threw it." (Id.). Moyer testified that although there were many agents, some of whom were wearing masks, and "a lot of commotion," she only saw Parker interacting with one agent. (Tr. at 300, 303-04, 306).

Agent Cromer testified that the apartment management did not have "any keys that could open up that garage." (Tr. at 144). Moyer also testified that "after

they had the key to [her] belief the key did not work to the garage." (Tr. at 300).

Agent Murphy observed that Parker and the apartment management were concerned whether there would be a way to get into the garage without damaging the door, so the agents informed Parker that they could pick the lock with a credit card. (Tr. at 362). According to Agent Cromer, Parker responded, "That's fine, go ahead," and "[Y]ou can get in there." (Tr. at 90, 146). Agent Cromer and Parker walked closer to the garage as agents picked the lock, and the agents offered Parker the chance to open the door first so there would not "be any issues or anything as far as [they] want[ed] [her] to witness" when the agents entered the garage. (Tr. at 90). Agent Cromer testified that Parker did not want to open the door, but that she consented to the agents opening the door and told them, "You guys open up the door and go ahead and go in." (Tr. at 90, 146). Agent Cromer testified that Parker was calm as the agents entered the garage and began searching the Ford Explorer where they located approximately $500,000 in cash, and that Parker only seemed agitated as she spoke about how she knew her apartment management did not like her and wanted to kick her out. (Tr. at 92); [Doc. 78-2 ¶ 27]. When agents completed the search of the Ford Explorer, the vehicle was seized and towed. (Tr. at 362-63).

After agents discovered approximately $500,000 in cash in the Ford Explorer, [Doc. 78-2 ¶ 27], Agent Larsen, who had remained at the DEA office, prepared an

affidavit and application for a search warrant for Gamory's Riverwalk Trail residence and presented it to United States Magistrate Judge E. Clayton Scofield, [Doc. 78-2]. In the affidavit, Agent Larsen described the DEA investigation of Gamory and Greene and included the information that had been provided by the CI.[10]  Agent Larsen stated that an analysis of drug ledgers obtained from defendant Olvera's trash in July 2006 revealed entries indicating that a person with the initials "J.B." had obtained a quantity of cocaine in exchange for money.  [Id. ¶¶ 18-19].  Agent Larsen reported that the CI informed agents that J.B. had been purchasing cocaine and marijuana from Juangorena for approximately two years and used the recording studio in Stone Mountain to conduct drug transactions.  [Id. ¶ 21].  She further stated that 10 months earlier, the CI had also been to J.B.'s residence at 4751 Riverwalk Trail, where the CI had received a large quantity of narcotics proceeds and had observed in the basement stairwell a hydraulic trap containing a large sum of currency.  [Id.]. Agent Larsen also stated that the CI reported that J.B. utilized Ford Explorers to transport cocaine and money secreted in a hydraulic trap in the rear area of the vehicles.  [Id. ¶ 22].

Agent Larsen also stated in the affidavit that on May 22, 2007, agents traveled

_____

[10] Agent Larsen disclosed the deal the DEA made with the CI to secure his cooperation, and she reported that he had proven reliable in that he had arranged another transaction in which an undercover agent received $36,600 in drug proceeds from an individual.  [Doc. 78-2 ¶ 20 n.1].

with the CI to the Riverwalk Trail residence and observed a Ford Explorer with a

North Carolina license plate in the driveway, and she recounted the events of May

23 and 24, in which the CI arranged for Gamory to purchase cocaine from

Juangorena. [Id. ¶¶ 22-25].[11]  Agent Larsen noted that on the day in which the drug

transaction was to occur, the CI was wearing a recording and transmitting device and

arrived at the recording studio, where he waited with Juangorena for Gamory to

arrive. [Id. ¶ 25].  Agent Larsen then recounted the agents' surveillance of Gamory's

residence and explained how Greene had become aware of the agents' surveillance,

drove to the garage at the Wesley Providence Apartments, and threw down the keys

to the Ford Explorer when agents approached him.  [Id. ¶ 26].  Agent Larsen then

provided the following information concerning the agents' entry into Parker's

apartment and garage:

> Agents contacted the manager's office and learned that the garage . . .
> was being rented by a female, [Parker].  Agents knocked on [Parker's]
> apartment door and asked for consent to search the garage.  [Parker]
> provided agents with consent to search the garage and agents thereafter
> made entry into the garage.  Upon entering the garage . . . , agents found
> the previously-observed Ford Explorer.  Based on the agents' belief that
> probable cause existed to believe that the Ford Explorer contained
> evidence of drug trafficking, namely money proceeds that were
> intended to be used to purchase the 35 kilograms of cocaine that JB and

---

[11] Gamory informed the CI that he would purchase the 35 kilos for a sum of $612,500, because he did not want to use all of the money that he currently had available.  [Doc. 78-2 ¶ 24].  It is not clear that the parties agreed on a final price for the cocaine.

the CS had negotiated, agents entered the Explorer and located a electronic hydraulic trap in the rear area of the vehicle. Upon opening the trap, agents observed a large quantity of currency secreted within the trap. Agents estimate that the quantity of money found in the trap exceeds [$500,000].

[Id. ¶ 27]. Agent Larsen concluded by stating that based on the surveillance, drug ledgers seized in July 2006, negotiations that occurred between the CI and Gamory, and information regarding the hydraulic trap in Gamory's residence, she believed large sums of money, which were the proceeds of narcotics, were being stored at the Riverwalk Trail residence. [Id. ¶ 28].

Finding that probable cause existed, Magistrate Judge Scofield issued a search warrant for 4751 Riverwalk Trail on May 24, 2007, [id. at 1], and the warrant was executed the next day. Gamory moves to suppress evidence obtained from the search of his Riverwalk Trail residence. [Docs. 54, 78]. Greene moves to suppress evidence obtained as a result of the searches conducted at 6301 Wesley Providence Apartments and the detached garage in Lithonia and the evidence obtained at the Riverwalk Trail residence. [Doc. 61].[12]

---

[12] However, Greene never presented any evidence to establish his standing to challenge the search of Gamory's residence, and his arguments with regard to that search are deemed abandoned.

## II. DISCUSSION

**A.**    *Greene's Motion to Supress, [Doc. 61]*

Greene seeks to suppress the evidence recovered from the warrantless search of the Ford Explorer.  First, he contends that the agents did not obtain consent to search the apartment or the garage where the Explorer was parked.[13]  Next, he argues that even if Parker did consent to the searches, her consent was not voluntary because she simply acquiesced to a show of force, and in any event, the search of the vehicle exceeded the scope of her consent.  Greene also asserts that the evidence recovered should be suppressed under Georgia v. Randolph, 547 U.S. 103 (2006), because the agents detained him and prevented him from objecting to the search.  Finally, he contends that the agents lacked probable cause to search the vehicle under the automobile exception to the warrant requirement.

### 1.    Consent to Search

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.    "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable   . . .  subject only to a few specifically established and

---

[13] The government does not contest Greene's standing to challenge the search of the apartment and the garage where the vehicle was located.  (Tr. at 52).

well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967) & Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971)). "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Id. at 360. "[T]he principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession– i.e. whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances." United States v. Boskic, No. 04-10298-DPW, 2006 WL 1540488, at *19 (D. Mass. June 2, 2006) (internal marks and citation omitted). See also United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995) (voluntariness of consent is judged in light of the totality of the circumstances). Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001). Ultimately, the burden

is on the government to prove that the consent was given voluntarily.  <u>United States</u>

<u>v. Bentley</u>, 151 Fed. App. 824, 827 (11th Cir. 2005) (unpublished) (<u>citing</u> <u>United States</u>

<u>v. Chemaly</u>, 741 F.2d 1346, 1352 (11th Cir. 1984)); <u>Tovar-Rico</u>, 61 F.3d at 1536 (<u>citing</u>

<u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983)); <u>United States v. Blake</u>, 888 F.2d 795, 798

(11th Cir. 1989).

### a.      Consent to Enter Apartment and Conduct Protective Sweep

Greene argues that Parker did not consent to the agents' search of the

apartment and garage, [Doc. 123 at 13-15], but the credible testimony from the

evidentiary hearing establishes that Parker consented to the agents' entry into and

cursory search of her apartment and to the search of the garage.[14]  Regarding the

entry into the apartment, Agent Cromer testified that he knocked on the door and

informed Parker that he was with the DEA and asked if agents could come in and

speak with her.  (Tr. at 68).  He testified that Parker was "apprehensive" but

otherwise "fine" and let him, Agent Williams, and Agent Murphy into the apartment.

(Tr. at 70, 72, 136).  Agent Murphy corroborated this version of the events, testifying

---

[14] Greene has moved to suppress the search of the apartment, but the testimony at the hearing established that the agents only made a protective sweep of the apartment after Parker admitted them, and no evidence was recovered from the apartment.  (Tr. at 70, 176, 368-70).  Consequently, the Court construes Greene's motion as a challenge to the agents' entry and protective sweep of the apartment and also considers these circumstances in connection with whether Parker voluntarily consented to the search of the garage.

that Parker allowed him, Agent Cromer, and Agent Williams to enter the apartment. (Tr. at 348, 370). Moreover, although Parker disputes how many officers she admitted into her apartment, (Tr. at 218), the government correctly points out that "no witness testified that [Parker] refused entry to any agents whatsoever." [Doc. 122 at 6].

Greene also consented to Agents Cromer, Murphy, and Williams performing a cursory check of her apartment. (Tr. at 68, 70). The agents' cursory check of the residence was analogous to a "protective sweep," which is "'a quick and limited search of a premise, incident to an arrest and conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.'" United States v. Rigsby, 943 F.2d 631, 637 (6th Cir. 1991) (quoting Maryland v. Buie, 494 U.S. 325 (1990)). Here, although Parker was not under suspicion, Greene had parked the Ford Explorer in the garage associated with Parker's apartment, and the agents reasonably needed to determine that no other persons were hiding in the apartment, so they searched all the rooms and under beds and in closet areas to determine whether anyone else was present. See United States v. Castillo, 48 Fed. App. 611, 613 (9th Cir. 2002) (unpublished) (finding police officers' initial entry into an apartment and search of apartment, including the closet, for a victim or suspect were lawful under the emergency

exception to the warrant requirement where officers had received burglary call, and upon arriving at apartment, observed signs of burglary); United States v. Sunkett, 95 F. Supp. 2d 1367, 1369 (N.D. Ga. 2000) (brief, limited search of bedroom closet, whose door was ajar, was reasonable where officers looked only in places where a person could hide and found weapons in plain view). Moreover, Parker consented to this cursory inspection, and the credible testimony indicates that the agents limited their search to areas where a person could hide. (Tr. at 68, 70, 128-30, 368-70). The only limitation Parker placed on this search was asking that only Agent Williams, a female, be allowed in her daughter's bedroom, and the agents complied. (Tr. at 350-52). Thus, the Court finds that Parker consented to the initial entry and protective sweep of her apartment.

### b.    Voluntariness of Consent

Greene argues that even if Parker did consent to agents searching her apartment, her consent was not voluntary because she simply acquiesced to a show of authority. [Doc. 123 at 13]. He points out that Parker testified there were more than 10 agents present at her apartment; that she heard a "whole bunch of people" running up her stairs; that she saw "guns, bullet proof vests, every letter of the alphabet, and ski masks"; that they "began banging on her door shouting they needed to talk to her" and told her they would "knock the door down if she didn't

comply"; and that Parker's initial intent was to only let one officer enter while the others pushed their way through her door.  [Doc. 123 at 2-3, 13-14].

Greene argues that the facts of this case are similar to those in Tovar-Rico, 61 F.3d at 1535, and United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986). [Doc. 123 at 11-14].  In Tovar-Rico, at least five officers knocked loudly on the defendant's door, announced their identity as police officers, and requested permission to enter when the defendant opened the door.  61 F.3d at 1535.  The officers entered quickly with guns, and after completing a protective sweep, an officer requested permission to again search the entire apartment because he thought nothing had been found and no other people were in the apartment.  Id.  The officer told the defendant she did not have to permit the search but that he would come back with a search warrant, and the defendant responded that she had just arrived and did not know what was going on, but agreed to the search and signed a written consent form.  Id. at 1536.  The Eleventh Circuit affirmed the district court's finding that the defendant opened the door to a "show of official authority" and did not know under the circumstances that she could have refused the officers' initial entry or refused the continued search after the officers had already looked through all of her rooms.  Id.

In Edmondson, agents did not have a search warrant or an arrest warrant for the defendant, but with "weapons drawn, and with the vicinity in front of [the

defendant's] apartment surrounded, the agents knocked on the door," and upon seeing the defendant look out the window, yelled "FBI. Open the door." 791 F.2d at 1514. The defendant opened the door, stepped back, and placed his hands upon his head, and once in the apartment, agents arrested him. Id. The Eleventh Circuit found that there was "no direct evidence that the defendant actually saw the officers' drawn weapons," but that he was "aware there were FBI agents at his door and at the bottom of the stairs" and that the "[p]resence of a number of officers tends to suggest an undertaking which is not entirely dependent on the consent and cooperation of the suspect." Id. at 1515 (internal marks omitted). The court held that the defendant's arrest was illegal, since a suspect "does not consent to being arrested within his residence when his consent to the entry into his residence is prompted by a show of official authority." Id. (citation omitted).

The instant case is distinguishable from Tovar-Rico and Edmondson. The credible testimony at the evidentiary hearing shows that Parker was not responding to a "show of official authority," but voluntarily consented to Agents Cromer, Murphy, and Williams entering her apartment. The agents did not have their guns drawn and did not yell or order Parker to open the door, nor did they threaten to break her door down if she did not open it. (Tr. at 68, 348). Similarly, upon Parker opening her door, the agents did not push their way into the apartment but requested

permission to enter. (Tr. at 68). Once they completed their initial cursory inspection, the agents did not request permission to search the apartment again, as in <u>Tovar-Rico</u>, but instead asked about gaining access to the garage. (Tr. at 84-85). The evidence also establishes that the agents offered no opposition to Parker's efforts to call 911 and her mother, and indeed, they encouraged her to make those phone calls if it would make her feel more comfortable with their presence. (Tr. at 136, 360).

After considering all the testimony, as well as the demeanor and interests of the witnesses, the Court finds that Parker's account of the events was not credible, whereas Agents Cromer and Murphy were credible. <u>See</u> <u>United States v. Pineiro</u>, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). "In making its credibility determination[s], the Court must take into consideration not only the interests of the witness[es], but also 'the internal consistency of the [witnesses'] testimony, or [their] candor or demeanor on the stand.'" <u>United States v. Tyler</u>, No. CR 106-075, 2006 WL 2094538, at *7 (S.D. Ga. July 26, 2006) (<u>quoting</u> <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 749 (11th Cir. 2002)). Parker's testimony that she only admitted Agent Williams into her apartment because she was a female, and that all the other agents rushed in behind her, conflicts with the testimony of the agents and that of her own mother. Agents Cromer and Murphy both testified that one agent would not have been allowed to

enter the residence by herself for safety and witness reasons. (Tr. at 70, 352). Agent Murphy was quite adamant that as a supervisor he would never allow an agent to enter a residence alone. (Tr. at 350-52). Moreover, Agents Murphy and Cromer were consistent and clear in their testimony that Parker allowed three agents into her apartment, while Parker gave vague testimony that she only allowed Agent Williams in, and that the rest of the agents eventually came in behind Agent Williams. (Tr. at 70, 136, 218, 254, 348).

Parker's mother's testimony corroborates that of the agents, as she testified that Parker told her over the phone that three agents were in the apartment, one in her bedroom, one in her daughter's bedroom, and one in the bathroom. (Tr. at 328). The other witnesses' consistent testimony concerning the sequence of events at the apartment is more credible and logical than Parker's version of events. See United States v. Stiner, 551 F. Supp. 2d 1350, 1353 (M.D. Fla. 2008) (girlfriend's testimony that two officers "'just came through the door'" without waiting for anyone to answer and simultaneously asked where was her boyfriend was "simply illogical" when compared to police testimony that they knocked on the door and were admitted into the residence when the girlfriend stood aside, indicating they could enter).[15]

---

[15] Greene argues that it is incredible, in view of Agent Murphy's testimony that he would never allow one agent to go into a residence by herself and both agents' testimony that they checked the apartment for safety reasons, to believe that the officers would not "run up the stairs and begin banging on Parker's door

In their totality, the circumstances presented in this case are far less coercive than circumstances in which the Eleventh Circuit has held consent was nonetheless voluntary. See e.g., United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993) (holding consent voluntary where defendant had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); Garcia, 890 F.2d at 361 (holding consent voluntary despite officers' refusal to accept suspect's conditional consent to search and threats to obtain a search warrant if suspect did not consent to a full search); United States v. Long, 866 F.2d 402, 404 (11th Cir. 1989) (holding consent voluntary where officers asked for consent to search, stating that, if refused, they would "dig the place up"); United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (holding consent voluntary despite fact that individual was arrested at gunpoint, forced to lie on the ground, and provided consent while one officer had his weapon drawn).[16]

_____

without their guns in at least a ready position." [Doc. 123 at 24]. However, there is no credible testimony that the officers banged loudly on the door or had their weapons drawn.

[16] Likewise, the agents' failure to have Parker sign a consent to search form, (Tr. at 148, 392), does not support Parker's contention that she did not voluntarily consent to the searches, [Doc. 123 at 15], because Parker orally consented and understood what was being asked of her. Agent Murphy testified that he did not believe a form was necessary because Parker was not the focus of the investigation, and no evidence would be used against her. (Tr. at 392-93). Moreover, lack of a consent to search form does not automatically render consent involuntary. See United States v. Smith, 199 Fed. App. 759, 761, 763 (11th Cir. 2006) (unpublished)

### c.     Consent to Enter and Search Garage

The credible testimony also establishes that Parker consented to the search of the garage, as she gave agents a key to use to attempt to unlock the side door, and then verbally consented to their use of a credit card to pick the lock when the key did not work.  (Tr. at 84, 86-88, 90, 360-62).  Parker first gave the agents a key to the garage when they were inside her apartment.  (Tr. at 86-88, 376).  When that key failed to work, the agents contacted the apartment manager who brought an extra key to the scene and gave it to Parker, telling her that she did not have to give the key to the agents.  (Tr. at 88, 297-98, 380).  Moyer testified that Parker took the key, walked away, and then tossed it down, but that when the agents tried the key, it did not work because the lock had been changed.  (Tr. at 298, 300).  The agents perceived that Parker was concerned about the door being damaged, so Agent Cromer told her that they could use a credit card to open the door without damaging it, and Parker told the agents, "That's fine, go ahead," and "You guys open up the door and go

_____

(finding oral consent voluntary where defendant did not sign consent to search form); United States v. Boukater, 409 F.2d 537, 538 (5th Cir. 1969) (oral consent voluntary even where defendant initially refused to sign written waiver, as he reiterated consent after refusing to put anything in writing).  Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*). See also United States v. Arvizu, No. 4:07CR762 HEA, 2008 WL 3853426, at *2 (E.D. Mo. Aug. 14, 2008) (defendant did not sign a consent form but gave oral consent and understood what was being asked).

ahead and go in." (Tr. at 90, 146).

Parker's testimony that she did not give the agents a key to the garage and did not even go to the garage until after her mother arrived to accompany her, (Tr. at 228, 230, 278), also is not credible. Again, Parker's assertions conflict with the testimony of the other witnesses, including her mother. Both agents testified that Parker gave them keys to the garage's side door and subsequently walked down to the garage before they entered it. Parker's mother testified that she did not even arrive at the Wesley Providence apartments until the agents were already searching the vehicle. (Tr. at 316, 332). Parker's testimony that Moyer "tossed" a set of keys toward her outside the garage, but that one of the agents caught them and ran with them to the garage,[17] (Tr. at 232, 280), is also incredible and inconsistent with Moyer's testimony that Parker took the keys from her and proceeded to walk away, (Tr. at 298).

### d. Voluntariness of Consent

The Court also finds that Parker's consent to search the garage was voluntary. Greene claims that agents pressured Parker about a key to the garage but did not disclose that the real object of their search was the vehicle inside the garage. [Doc. 123 at 14]. However, the agents asked Parker about the Ford Explorer, and she said

---

[17] This testimony is also inconsistent with Parker's claim that the agents were already searching the vehicle when she arrived at the garage.

she knew nothing about it. (Tr. at 84, 146, 224, 361-62).[18] There is no indication that the agents were attempting to manipulate Parker about their purpose for entering the garage. Indeed, the only pressure allegedly exerted on Parker at the garage was Moyer's testimony that an agent said Parker should give them the keys because it was the "right thing to do." (Tr. at 300). The Court does not find this to be coercive enough to render Parker's consent to the agents' entry into the garage involuntary. Moyer testified that she told Parker that she did not have to give the apartment management key to the agents, (Tr. at 232), but Parker took the key and tossed it on the ground. Moreover, after that key failed to work, Parker agreed to allow the agents to use a credit card to pick the lock so the door would not be damaged. (Tr. at 90, 146).

In short, the Court finds that Parker's version of events is not credible because

_____

[18] Greene argues that the testimony of Parker's mother and Moyer indicates that Parker was "still very distressed and evidently being manipulated by agents in the parking lot outside the garage." [Doc. 123 at 14]. However, there was no indication from either Parker's mother or Moyer that Parker had actually refused to allow the agents to search the garage, and Moyer testified that Parker had a confrontation with one of her staff members and wanted to know why she and the staff member needed to be present, (Tr. at 294, 303-04), which supports Agents Cromer and Murphy's testimony that the only time Parker actually seemed to be upset at the garage was when she was involved in a dispute with the apartment management, (Tr. at 92, 392).

it is inconsistent with the credible testimony of the other witnesses.[19]  "Having reviewed the testimony at the hearing, noted inconsistencies and/or an apparent lack of candor in [Parker's] testimony on multiple fronts, observed the demeanor of the witnesses, and considered the interests of the witnesses, the Court concludes that [Parker's] testimony . . . is simply not credible."  Tyler, 2006 WL 2094538, at *8.  See Stiner, 551 F. Supp. 2d at 1355-56 (officers had no prior knowledge of defendant or contact with him, and girlfriend had "obvious interest" in the defendant remaining

---

[19] Greene also points out that Agent Murphy's response to many questions was that he could not recall certain details, and he also draws attention to discrepancies between Agent Cromer and Agent Murphy's testimony. [Doc. 123 at 23-26].  However, Agent Murphy recalled the relevant details regarding gaining consent from Parker to enter the apartment and search the garage and recalled that Parker produced a set of keys.  (Tr. at 348, 356).  Greene claims that Agent Murphy could not recall whether they had keys to the garage, but the record indicates that he was referring to the keys to the Explorer, not the garage.  (Tr. at 363).  Although he could not recall whether Parker ever asked the agents to leave, he testified that the only times she appeared to be "irate" or "irritated" were during her 911 call and during her dispute with the apartment management, suggesting that she never actually asked the agents to leave.  (Tr. at 391-92).  Moreover, the discrepancies Greene points out are minor.  Although Agent Cromer testified that Parker handed him a set of keys and Agent Murphy testified that he was the one given the keys, their testimony is consistent that Parker at least produced keys, and both were consistent in recalling that the keys did not work and that they ultimately picked the lock with a credit card.  Agent Cromer's testimony that Parker's mother was present when Parker told the agents, "That's fine, go ahead," when told they could get into the garage with a credit card, (Tr. at 90), although differing slightly from Agent Murphy's testimony that Parker's mother arrived after the search had begun, (Tr. at 364), is not material, since he, Agent Murphy, and Parker's mother indicated that agents were already down by the garage when Parker's mother arrived, (Tr. at 88-90, 316, 364).

free from incarceration); <u>United States v. Smalls</u>, No. 08-20726-CR, 2008 WL 4724480, at *7-8 (S.D. Fla. Oct. 24, 2008) (Magistrate Judge's Report and Recommendation adopted at 2008 WL 4724480, at *1); [<u>see also</u> Doc. 122 at 14]. Thus, the Court finds that Parker voluntarily consented to the agents' entry into and protective sweep of her apartment and to the entry into and search of the garage.

**2.** *Georgia v. Randolph*

Greene next contends that even if Parker did voluntarily consent to the search, the evidence seized should be suppressed because the agents violated <u>Randolph</u>, 547 U.S. 103, by detaining him in a vehicle to prevent him from objecting to the warrantless search. [Doc. 123 at 15-16]. In <u>Randolph</u>, the defendant's wife had complained to the police about her husband's drug use and volunteered that there were "items of drug evidence" in their house. 547 U.S. at 107. The police asked the defendant for permission to search the house, but he refused, and the police then turned to the wife and asked for her permission, which she gave. <u>Id.</u> However, the Supreme Court held that a third party resident's consent to search is not valid over the objection of a physically present resident. <u>Id.</u> at 120. The Court explained:

> [I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out. . . . So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection,

there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

Randolph, 547 U.S. at 121-22.

The government argues that this case is distinguishable from Randolph, and that the Supreme Court's decision in United States v. Matlock, 415 U.S. 164, 171 (1974), controls. In Matlock, the defendant was arrested in the front yard of his house, and agents did not ask the defendant for consent to search the house but instead obtained it from a third party in the house. Id. The Court upheld the search as being valid pursuant to the third party's common authority over the premises.[20] Thus, the government claims that Matlock controls as long as there is no evidence that the police intentionally removed the potentially objecting co-tenant for the sake of avoiding a possible objection. [Doc. 122 at 23].

Greene argues that the agents "knew, or in light of all the experience they claimed to have, should have known, he had a privacy interest in the garage and vehicle." [Doc. 123 at 16]. However, the Court finds that there is no evidence that the police deliberately removed Greene from the scene for the sake of avoiding him

---

[20] The Court defined "common authority" as "mutual use of the property by persons generally having joint access or control for most purposes." Matlock, 415 U.S. at 171 n.7. It is undisputed that Parker had common authority over both the apartment and the garage in this case.

voicing an objection. The agents apprehended and detained Greene after he threw down the keys to the vehicle and fled when agents approached him. (Tr. at 60-62). Agent Murphy testified that this conduct indicated to the agents that Greene was trying to disassociate himself from the vehicle, suggesting that he was linked to the drug transaction that been set up for earlier that day. (Tr. at 62, 118). Agent Cromer testified that he placed Greene in his car for safety reasons, read him his <u>Miranda</u> warnings, and that Greene refused to make any statements. (Tr. at 64). Agents then went to the apartment leasing office to determine who owned the apartment that was associated with the garage where the Explorer was parked. (Tr. at 66, 122). When the agents learned the apartment and garage were leased to Parker, they reasonably proceeded to the apartment to talk to her about obtaining consent to search the garage. (Tr. at 66, 122, 124). Since Greene's name was not on the lease and he had not been associated with Parker's apartment, Agent Murphy was not satisfied that Greene had authority to consent to a search of the garage, so he decided to approach the occupant of the apartment. (Tr. at 368, 388).

"[N]othing in *Randolph* suggests that the police must offer . . . an opportunity [for an arrested defendant to object to the search]." <u>United States v. Travis</u>, No. 07-15424, 2009 WL 331379, at *3 (11th Cir. Feb. 12, 2009) (unpublished). "To the contrary, the *Randolph* Court stated that 'we think it would needlessly limit the

capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received.'" Id. (quoting Randolph, 547 U.S. at 122). Thus, Matlock controls, and Greene, who, based on the record, was not present to object and did not express any objection to Agent Cromer, cannot challenge Parker's voluntary consent to search the apartment or garage. See United States v. Harris, 526 F.3d 1334, 1339 (11th Cir. 2008) ("[T]he extension of the prohibition on warrantless searches applies only to defendants who are present and actually express a refusal to consent.").

### 3. Probable Cause to Search the Ford Explorer

Greene argues that the search of the Ford Explorer exceeded the scope of Parker's consent to search the garage since agents never specifically asked Parker for consent to search the Ford Explorer, and Greene contends that the automobile exception does not apply because the agents lacked probable cause to search the vehicle. [Doc. 123 at 19-23]. While it is undisputed that the agents did not ask Parker for consent to search the Explorer, they were nevertheless authorized to search the vehicle under the automobile exception to the warrant requirement.

"The legality of a warrantless automobile search is based on the existence of probable cause to believe that the automobile is carrying contraband subject to forfeiture under the law, and the difficulties of securing a moveable vehicle while a

34

warrant is obtained." United States v. Thomas, 536 F. Supp. 736, 742 (M.D. Ala. 1982). See also Chambers v. Maroney, 399 U.S. 42, 51-52 (1970); United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir. 1988). Thus, a warrantless search of an automobile is authorized where probable cause coupled with exigent circumstances is present. Thomas, 536 F. Supp. at 742 (citing Coolidge, 403 U.S. at 458-64). Probable cause to search exists "'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" Alexander, 835 F.2d at 1409 (quoting United States v. Clark, 559 F.2d 420, 424 (5th Cir. 1977)) (alteration in original). Exigent circumstances exist by the mere potential mobility of the vehicle. United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990) (the requirement of exigent circumstances is satisfied by the "ready mobility" inherent in all vehicles that reasonably appear to be capable of functioning). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825 (1982).

In United States v. Tobin, 923 F.2d 1506, 1508 (11th Cir. 1991), U.S. Customs and DEA agents obtained voluntary consent to enter the defendant's house and go to his garage. Id. Once the defendant opened his garage door, the agent standing outside could see cocaine in tubular bags on the floor, and the agents placed the

defendant under arrest and seized the cocaine. An agent looking through the windows of a station wagon parked in the garage noticed that the screws had been removed from the floorplate over the wheel well in the rear of the vehicle; upon opening the back of the vehicle and lifting up the wheel well cover, the agent found grocery bags full of cash. Id. The *en banc* Eleventh Circuit held that the agents' warrantless entry into the house was justified based on the owner's voluntary consent, and therefore the search of the garage and seizure of the cocaine were justified based on that consent, and the search of the station wagon was justified based on the automobile exception. Id. at 1513. The agent's sighting of screws removed from the wheel well cover gave rise to probable cause to believe the wheel well contained contraband, and the evidence of exigent circumstances, which "need not be overwhelming to justify the warrantless search of an automobile," were that both defendants denied ownership of the vehicle, "indicating to the agent that the true owner could have arrived and driven the vehicle away, thus depriving the government of evidence if the agent did not act immediately." Id. (citation omitted).

Here, the warrantless search of the Ford Explorer was supported by probable cause to believe it contained contraband. The CI, who had proven to be reliable in another matter, told agents that Gamory used Ford Explorers with out of state license plates to move drugs and narcotics proceeds, and the CI had seen a secret

compartment in one of the Ford Explorers used for stashing contraband. (Tr. at 202-04). The CI also reported that Greene, known to the CI as Smooth, was one of Gamory's associates who worked at the Stone Mountain recording studio, "help[ed] drive money," and had been at Gamory's residence when narcotics proceeds were picked up. (Tr. at 166, 182, 184). The CI negotiated a sale of 35 kilos of cocaine to Gamory from Juangorena, the source of supply the CI had previously identified to agents. (Tr. at 166-68). On the day of the proposed deal, the CI arrived at the recording studio and called Gamory, who said he would be there in a few minutes. (Tr. at 170). At about the same time, Greene arrived at Gamory's residence and left the residence driving the Ford Explorer. (Tr. at 170-72). While driving toward the predetermined meet location, Greene conducted a "heat check," indicating that he knew he was being followed, and after Gamory called off the meeting because "something was wrong," Greene sped away and after he parked the Ford Explorer, he ran from agents when they approached him, tossing the keys to the vehicle aside. (Tr. at 58, 62, 104, 114, 178, 180). The totality of these circumstances provided probable cause to believe that the Ford Explorer was linked to criminal activity of which Greene was a part. See Tobin, 923 F.2d at 1513 (agent's sighting of screws removed from wheel well cover constituted probable cause to believe wheel well contained contraband); United States v. Hanline, 131 Fed. App. 91, 92-93 (9th Cir.

2005) (unpublished) (where defendant drove her car less than one block, looked in direction of marked police car, shifted into reverse and drove away from police car, causing her tire to squeal, then left her car and ran away from it and provided no explanation as to why she had fled, these facts, along with other evidence against defendant, provided probable cause to arrest defendant); United States v. Martinez-Molina, 64 F.3d 719, 731 (1st Cir. 1995) (agents' determination that defendant owned vehicle in which agents had observed U.S.D.A. Agricultural inspection stickers, which are commonly used to bypass agricultural inspection at airport, along with previous observations and cash and tickets already seized, were "sufficient to warrant the [a]gents' believe that the [vehicle] was being used to transport narcotics"); United States v. Christophe, 470 F.2d 865, 868-69 (2d Cir. 1972) (probable cause for warrantless search existed where defendant, whom police believed to be someone else, was seen driving up to house of known drug dealer in cautious fashion, parking only after receiving signal from inside house, transporting valise into trunk of car, traveling to meet other narcotics dealer, driving at high speed when agents attempted to stop him, and attempting to escape on foot).

The facts here are similar to those in Tobin, in which the Eleventh Circuit held that exigent circumstances existed even though the station wagon was located in a private garage and both defendants had been arrested, since exigent circumstances

"need not be overwhelming to justify the warrantless search of an automobile." 923 F.2d at 1513. In that case, both defendants denied ownership of the vehicle, indicating that the true owner could have arrived at any time and driven the vehicle away, so the agent had to act immediately so as not to deprive the government of evidence. Id. Similarly, although the Ford Explorer was located in a private garage and Greene was already under arrest, he had tossed aside the keys to the Ford Explorer, essentially disclaiming ownership of the vehicle. While the agents had the set of keys Greene threw down, they did not know who else may have had keys to the vehicle. After all, the vehicle had out of state license plates and had been parked at Gamory's residence earlier that day, and the agents had to break surveillance on the car that left Gamory's house in tandem with the Explorer. (Tr. at 172-74). Likewise, Parker was not familiar with the Explorer and did not assert an ownership interest. Thus, someone else could have tried to gain access to the Explorer and driven it away before agents obtained a search warrant for it.[21] See also United States

[21] Greene contends that this case is factually similar to United States v. Virden, 488 F.3d 1317, 1320-22 (11th Cir. 2007). [Doc. 123 at 21-22]. In Virden, the Eleventh Circuit held that officers, who had observed the defendant's rental car exit the garage of a private residence and then handcuffed the defendant and placed him in the patrol car to conceal him from the nearby target of their drug investigation, lacked the requisite probable cause to seize the defendant's rental car. The defendant indicated that he had just left a girl's residence but stated that he was from out of town and not familiar with the area. The court determined that the officers lacked probable cause where the facts known about the defendant were that he left a location of suspected drug activity, appeared to have control over a garage

v. Reed, 26 F.3d 523, 525, 530 (5th Cir. 1994) (upholding warrantless search of automobile located in front of defendant's house even though defendant and wife were in custody and police had car keys because defendant had "diminished expectation of privacy in his car," and leaving the car would have been risky because "nearly the entire neighborhood was outside, observing the events as they unfolded at [the defendant's] house," and police could not know whether other keys existed, or whether others were implicated in the robbery for which defendant was arrested and were already escaping with money).

**B.**   ***Gamory's Motion to Suppress Evidence Recovered from his Residence Located at 4751 Riverwalk Trail, Lilburn, Georgia, [Docs. 54, 78]***

Gamory argues that Agent Larsen's affidavit, submitted in support of her application for the warrant to search his residence, failed to establish probable cause and also contained a "material and false statement made knowingly and intentionally or in reckless disregard for the truth," in violation of Franks v. Delaware, 438 U.S. 154 (1978), namely, that Parker granted government agents permission to search her

---

because the garage door closed without anyone else being seen, and misstated to the police exactly where he had been. Id. at 1322. The Court finds that the facts known at the time the Explorer was searched were stronger than those in Virden, as the CI had provided specific information about Gamory and Greene's past participation in drug trafficking, and had arranged a 35 kilo purchase with Gamory's source of supply, and when surveillance of the planned transaction was detected, Gamory called off the deal, and Greene sped away and threw down the keys to the Ford Explorer when approached by agents.

home and the garage where the Ford Explorer was parked, [Doc. 78 ¶¶ 1-3; Doc. 78-2 ¶ 27]. Gamory acknowledges that he lacks standing to challenge the search of the garage, but he argues that the "probable cause making the basis for the subsequent search of [Gamory's] residence was the result of an illegal search and is as such 'fruit of the poisonous tree.'" [Id. at 3]. Gamory argues that a <u>Franks</u> hearing is necessary because the agents' "illegal entry into the [g]arage was done in the presence of civilian witnesses who are prepared to testify at the suppression hearing," and because the government "continues to argue that [Parker] gave consent while [Parker] adamantly and unequivocally states that she did not give such consent." [Doc. 86 at 4-5].[22]

### 1. *Franks* Hearing

A presumption of validity attaches to an affidavit supporting a search warrant application. <u>Franks</u>, 438 U.S. at 171. To be entitled to an evidentiary hearing, a defendant must make "'a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit, or made the false

---

[22] Gamory relies on Parker's affidavit to support the contention that Agent Larsen made false statements to secure the search warrant. [Gov. Ex. 1 (Parker Aff.)]. Parker averred that when agents asked if they could come into her apartment on May 24, 2007, she said, "No you need a warrant," and that she told the agents they needed a search warrant to look in her garage. Gamory asserts that at "no time did [Parker] grant authority or permission for anyone to open or search [her] apartment or the garage." [Id.].

statement with reckless disregard for its truth,'" and "'the false statement was necessary to the finding of probable cause.'" <u>United States v. Maharaj</u>, No. 07-80024-CR-CR, 2007 WL 2254559, at *6 (S.D. Fla. Aug. 2, 2007) (<u>quoting</u> <u>Franks</u>, 438 U.S. at 156). <u>See also</u> <u>United States v. Burston</u>, 159 F.3d 1328, 1333 (11th Cir. 1998). "'The <u>Franks</u> standard is a high one.'" <u>United States v. Nakouzi</u>, No. 3:05CR154(MRK), 2005 WL 3211208, at *5 (D. Conn. Nov. 30, 2005) (<u>quoting</u> <u>Rivera v. United States</u>, 928 F.2d 592, 604 (2d Cir. 1991)). Thus, "'[t]o mandate an evidentiary hearing, the challenger's attack [on the affidavit] must be more than conclusory and must be supported by more than a mere desire to cross-examine.'" <u>Id.</u> (<u>quoting</u> <u>Franks</u>, 438 U.S. at 171).

Negligent or innocent mistakes in a warrant application do not violate a defendant's Fourth Amendment rights. <u>See</u> <u>Maughon v. Bibb County</u>, 160 F.3d 658, 660 (11th Cir. 1998); <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1326-27 (11th Cir. 1997); <u>Franks</u>, 438 U.S. at 171. Moreover, "'[i]nsignificant and immaterial misrepresentations or omissions will not invalidate a warrant.'" <u>Maharaj</u>, 2007 WL 2254559, at *7 (<u>quoting</u> <u>United States v. Ofshe</u>, 817 F.2d 1508, 1513 (11th Cir. 1987)). Indeed, every fact recited in an affidavit in support of an application for a search warrant does not necessarily have to be correct, but the affidavit must be truthful in the sense that it is believed or appropriately accepted by the affiant as true. <u>Franks</u>,

438 U.S. at 165. "[O]nly in rare instances is a *Franks* hearing merited when facts have been omitted in a warrant application" because "[a]llowing omissions to be challenged would create a situation where almost every affidavit of an officer would be questioned." United States v. Lievertz, 247 F. Supp. 2d 1052, 1058 (S.D. Ind. 2002) (quoting Mays v. City of Dayton, 134 F.3d 809, 815 (6th Cir. 1998)).

The defendant also bears the burden of showing that absent the alleged misrepresentations or omissions, probable cause would have been lacking. United States v. Umole, 162 Fed. App. 948, 950 (11th Cir. 2006) (unpublished) (quoting United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001); Maharaj, 2007 WL 2254559, at *6 (citing United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001)). Upon such proof by the defendant, the Court must suppress the items seized pursuant to the defective search warrant. See United States v. Weber, 808 F.2d 1422, 1424 (11th Cir. 1987); United States v. Kirk, 781 F.2d 1498, 1502 (11th Cir. 1986). However, "if the court is satisfied that when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, then no hearing is required." Nakouzi, 2005 WL 3211208, at *5 (internal citation and marks omitted).

Gamory has not met the strict standard for obtaining a Franks hearing. The only falsity or omission alleged by Gamory concerns whether Parker consented to the

search of the garage. [Doc. 86 at 3]. However, Gamory has not made a substantial preliminary showing that Agent Larsen knowingly and intentionally made a false statement in the affidavit. Agent Larsen was not on the scene at the garage, but remained at her office so that she could apply for a search warrant if agents developed probable cause. (Tr. at 168). Hence, she relied on information relayed to her from agents at the scene. There is no evidence that Agent Larsen was told Parker did not consent to the search but then falsely stated in the affidavit she had consented. While Parker claims that she did not consent to the search of the garage, the agents at the scene believed she had consented and relayed that information to Agent Larsen, who included it in her affidavit. (Tr. at 176); [Doc. 78-2 ¶ 27].[23] However, even if the Court accepted Parker's statement that she did not consent to the search and set aside the alleged false statement in the affidavit that she did consent, Gamory would still not be entitled to a <u>Franks</u> hearing because, when that statement is set aside, "there remains sufficient content in the warrant affidavit to support a finding of probable cause." <u>Nakouzi</u>, 2005 WL 3211208, at *5.[24]

---

[23] Moreover, as discussed earlier, after considering the testimony of Parker and the agents in connection with Greene's motion to suppress, the Court finds that Parker did in fact consent to the search.

[24] Gamory's "fruit of the poisonous tree" argument fails since the Court found no illegality with regard to the search of the garage and the Explorer. Moreover, Gamory lacks standing to utilize such an argument with respect to these searches. <u>See</u> <u>United States v. McConnell</u>, 500 F.2d 347, 348 (5th Cir. 1974) (*per curiam*)

## 2.    Facial Challenge to the Search Warrant

Gamory claims that the search warrant affidavit is "vague and thus, unreliable as to any detailed description as to exactly what evidence was located at [Gamory's] residence and what, if any, illegal activity had been conducted by this defendant," has no "'explicit and detailed description of alleged wrongdoing,'" and has no corroborating evidence of any cocaine transaction.    [Doc. 78 ¶ 3(g), at 7 (quoting United States v. Foree, 43 F.3d 1572, 1576 (11th Cir. 1995)].  The government responds that Agent Larsen provided "both historical and current investigative activity in the affidavit to establish probable cause."  [Doc. 83 at 15].

Gamory presents a facial challenge to the validity of the search warrant, and the standard of review on such a challenge is a deferential one.  United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994).  The Eleventh Circuit has summarized the essence of the Court's review as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions.  In particular, issuing magistrates are given the unenviable task of making "firing line"

---

(defendant's attempt to rely on court's holding in another case that search of defendant's employee's vehicle was illegal, thus arguing that his conviction fell under fruit of the poisonous tree, failed for "lack of standing to contest the search of [his employee's] vehicle").

decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference. In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

Id.

"In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resultant from warrants issued without probable cause, the issuing magistrate 'is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability" that "an offense has been committed and that evidence exists at the place for which the warrant is requested." Id. at 1361 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)); United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984). "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Gates, 462 U.S. at 241 (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). See also Adams v. Williams, 407 U.S. 143, 149 (1972). "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Miller, 24

F.3d at 1361. Furthermore, "the fact than an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985). See also Adams, 407 U.S. at 149 (citation omitted). In short, the Court should uphold the finding of probable cause unless the finding was arbitrary. Betancourt, 734 F.2d at 754; United States v. Long, 674 F.2d 848, 852 (11th Cir. 1982).

Gamory's claim that Agent Larsen failed to specify what evidence had been located at his residence and what illegal activity he had engaged in fails upon an examination of the warrant affidavit. Agent Larsen's affidavit specifically states that the CI reported that he had been in Gamory's residence 10 months earlier to take receipt of a large quantity of narcotics proceeds, and he had also observed a hydraulic trap located in Gamory's basement stairwell that contained a large sum of currency. [Doc. 78-2 ¶ 21]. Agent Larsen added that the CI had proven to be reliable in another matter, [id. ¶ 20 n.1], and this historical information, coupled with the drug transaction he arranged with Gamory when Juangorena called offering to sell cocaine, as well as Agent Larsen's training and experience,[25] supplied probable cause for Magistrate Judge Scofield to find that Gamory was engaging in drug trafficking

---

[25] Agent Larsen averred that, based on her training and experience, it is a "common practice for drug dealers to secrete . . . the proceeds of the sale and distribution of controlled dangerous substances . . . in their residences" and that such persons "have concealed caches of . . . currency." [Doc. 78-2 ¶ 4(c)].

and that evidence of his activities would be found in his residence. See United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995) ("We accord great deference to judicial determination of probable cause to issue a search warrant."); Long, 674 F.2d at 652 ("[I]f a magistrate, using his own judgment based on the entire picture presented to him and utilizing his common sense finds probable cause, his determination is conclusive in the absence of arbitrariness.") (internal marks and citation omitted).

Gamory's contention that the warrant fails to specify that he engaged in any alleged wrongdoing is without merit. As discussed above, the CI had already observed evidence of illegal narcotics trafficking in Gamory's residence. The affidavit provides information that "JB," or Gamory, had been a longtime customer of a Mexican drug dealer, that the initials "JB" were seen on drug ledgers, and that JB had spoken with the CI on May 23, 2007, about purchasing 50 kilos of cocaine from the supplier, and had spoken with the CI again about the prearranged drug transaction on May 24, 2007. [Doc. 78-2 ¶¶ 18-19, 21, 24-25]. All of these details provide sufficient evidence that Gamory had engaged in criminal wrongdoing or was about to engage in criminal wrongdoing and thus provided probable cause to believe that evidence of such wrongdoing would be found in his residence. See Miller, 24 F.3d at 1361; Betancourt, 734 F.2d at 754.

### a. Reliability of the Confidential Informant

Gamory argues that the affidavit did not provide sufficient facts pertaining to the source of the evidence establishing probable cause and has "provided only a scintilla of evidence relevant to the reliability of the CI," without showing independent police corroboration. [Doc. 86 at 11-12]. However, independent police corroboration of an informant is not required to establish probable cause. United States v. Brundidge, 170 F.3d 1350, 1353 (11th Cir. 1999). Rather, the "'relevant considerations in the totality of the circumstances,'" are the informant's veracity and basis of knowledge, and "'a deficiency in one may be compensated for . . . by a strong showing as to the other.'" United States v. King, 233 Fed. App. 969, 972 (11th Cir. 2007) (unpublished) (quoting Brundidge, 170 F.3d at 1353) (omission in original). The basis of the CI's information in this case, as provided in the affidavit, was his personal knowledge that Gamory had been involved in dealing cocaine and marijuana for the last two years in Atlanta, that he went by the initials "J.B.," that Gamory was one of Juangorena's long-time customers, and that Gamory often used dark-colored Ford Explorers to transport drugs and money. The CI had been to Gamory's residence 10 months earlier and had observed a hydraulic trap containing a large amount of currency and had personally taken receipt of the proceeds of a narcotics exchange. [Doc. 78-2 ¶¶ 21-22]. See United States v. Sutton, No. 8:04-CR-325-T-17TBM, 2007 WL 705044, at *5 (M.D. Fla. Mar. 2, 2007) ("The Eleventh Circuit

has held that when a confidential informant witnesses first-hand the alleged wrongdoing, greater weight is given to the confidential informant's veracity and basis of knowledge . . . .") (citing Brundidge, 170 F.3d at 1353).[26]

Agents were able to corroborate information provided by the CI. They observed the initials "J.B." on the drug ledgers recovered from Olvera's trash, which corroborated the CI's information that Gamory, who used the nickname J.B., was a customer of a drug dealer. Two days before the date in which the prearranged transaction was to occur, the CI traveled with agents to Gamory's residence and saw a dark-colored Ford Explorer with a North Carolina plate, which was the same Ford Explorer Greene drove from Gamory's residence on May 24, 2007, and from which agents recovered approximately $500,000 in cash after searching it. [Doc. 78-2 ¶¶ 18-19, 22, 26-27]; (Tr. at 202, 214). These police observations were consistent with the CI's information that Gamory used dark-colored Ford Explorers to transport drugs and money. Moreover, the agents who searched the Ford Explorer in the garage at the Wesley Providence Apartments discovered a hydraulic trap in rear of the vehicle filled with cash, corroborating the CI's information that Gamory secreted cocaine and

---

[26] Although the CI received compensation for his assistance, he was a registered informant with the DEA and had rendered prior assistance to the DEA as recently as May 10, 2007, when he arranged for an undercover agent to pick up money proceeds believed to be derived from the sale of narcotics. [Doc. 78-2 ¶ 20 n.1]

money in hydraulic traps located in the rear of his vehicles. [Doc. 78-2 ¶ 27]. <u>See</u> <u>United States v. Phillips</u>, No. CR 306-016, 2007 WL 1428857, at *5 (S.D. Ga. May 10, 2007) (CI's recitation of facts surrounding controlled purchase were corroborated through police surveillance of controlled purchase and because police confirmed defendant matched description given by informant and found a bag of cocaine on passenger in defendant's vehicle).[27]

Agent Larsen stated that Gamory spoke to the CI in coded language which, based on Agent Larsen's training and experience, pertained to the illegal exchange of currency for narcotics,[28] and agents personally observed Greene engage in suspicious behavior almost immediately after leaving Gamory's residence when he conducted a heat check, drove erratically, sped up, and discarded the car keys when

---

[27] The fact that Agent Larsen was not directly involved in the surveillance of Gamory's residence on May 24, 2007, also does not render her search warrant affidavit lacking in probable cause. <u>See</u> <u>United States v. Warren</u>, Crim. Action No. 1:08-cr-55-WHA, 2008 WL 2949541, at *3 (M.D. Ala. July 31, 2008) (agent's lack of firsthand observation of CI during controlled buy did not prevent finding of probable cause because agent described how she was familiar with CI, CI had performed controlled buys in the past, and the controlled buy process, in which CI was preliminarily searched for drugs and money, partially followed to defendant's residence, and performed controlled buy while being recorded, increased CI's credibility).

[28] The CI was wearing a transmitting device through which DEA agents could monitor his movements and communications, which substantiates the CI's veracity. [Doc. 78-2 ¶ 25]. <u>See</u> <u>Sutton</u>, 2007 WL 705044, at *5 ("[C]orroboration may occur when the confidential informant is placed in 'circumstances under which [she/he] is unlikely to lie.'") (quoting <u>Brundidge</u>, 170 F.3d at 1353).

agents approached him at the Wesley Providence Apartments. [Doc. 78-2 ¶ 26]. All of these circumstances, which are documented in Agent Larsen's affidavit, corroborated the CI and supported a finding of probable cause that evidence of contraband would be found in Gamory's residence. See United States v. Bain, 736 F.2d 1480, 1488 (11th Cir. 1984) (probable cause existed where officers approached a vessel based on CI's report that suspicious activities were occurring and observed that captain had no customs documents, noticed that vessel was "unusually plush" for a fishing vessel, and that the defendant was seen moving suspiciously back and forth between the same cabins); United States v. Crawford, 420 F. Supp. 2d 142, 143 (W.D.N.Y. 2006) (finding of probable cause upheld where CI who had proved to be reliable in past made several purchases of cocaine from two individuals at subject residence, wore transmitter so surveillance officers could monitor him, observed firearms and cocaine at subject residence, and made observations that were confirmed by police officer).

### b. Staleness

Gamory also argues that the information contained in the search warrant was "fatally stale," [Doc. 86 at 10], but the government responds that investigations "involving long-term drug conspiracies rarely give rise to staleness problems." [Doc. 83 at 23]. The Court finds that the information contained in this affidavit was not fatally stale because it pertained to an ongoing drug trafficking operation. "'[I]f an

affidavit recites activity indicating protracted or continuous conduct, time is of less significance.'" United States v. Haimowitz, 706 F.2d 1549, 1555 (11th Cir. 1983) (quoting United States v. Weinrich, 586 F.2d 481, 491 (5th Cir. 1978)). "Protracted or continuous drug activity is inherent in large-scale drug trafficking operations. In such cases, then, the staleness issue should be construed liberally." United States v. Williams, 177 Fed. App. 914, 921 (11th Cir. 2006) (unpublished) (internal marks and citation omitted).

Here, the CI provided information that Gamory had been involved in dealing cocaine and marijuana for at least two years and had established methods of transporting and picking up drugs and money. The CI had been in Gamory's residence 10 months earlier to take receipt of monetary proceeds from the sale of narcotics, and he observed a hydraulic trap in the home, suggesting Gamory had a sophisticated drug trafficking operation. This information was contained in the affidavit, and in the context of a long-term drug trafficking operation, such information is not stale for purposes of establishing probable cause. See United States v. Harris, 20 F.3d 445, 451 (11th Cir. 1994) (upholding validity of search although affidavit referred to events that occurred two years prior because they pertained to long-term drug conspiracy). Thus, "[i]t is reasonable to infer that the use of [Gamory's residence] for the sale of drugs [would] continue over some period of time." Id. (internal marks and citation omitted). The Court does not find that the

information in the affidavit is fatally stale.[29]

### 3.    Good Faith Exception

Even were the Court to find that the search warrant was not supported by

probable cause, Gamory's motion would still be due to be denied because the agents

reasonably relied in good faith on the warrant signed by Magistrate Judge Scofield.

[See Doc. 83 at 29-31].    Under United States v. Leon, 468 U.S. 897 (1984), "the

exclusionary rule should not be applied to exclude evidence seized pursuant to a

_____

[29] Gamory contends that the affidavit "contained no experience to fact analysis" by Agent Larsen.  [Doc. 86 at 14].  However, the government argues that Agent Larsen's opinions and conclusions may properly be considered as a factor in the totality of the circumstances when evaluating whether a warrant was supported by probable cause.  [Doc. 83 at 25 (citing Robinson, 62 F.3d at 1331 n.9 & United States v. Jenkins, 901 F.2d 1075, 1080-81 (11th Cir. 1990))].  Agent Larsen relayed her knowledge that traffickers of controlled substances often keep ledgers and records relating to illicit drug trafficking operations; that drug dealers often secrete controlled dangerous substances in secure locations in their residences, and that controlled substances are often hidden inside secret compartments in vehicles parked in the garages or driveways of residences; and that drug traffickers often generate substantial profits as a result of illegal drug dealing.  [Doc. 78-2 ¶ 4].  The information Agent Larsen provided in the affidavit to establish probable cause pertained to, among other things, the use of ledgers listing the name "J.B.," secret compartments and hydraulic traps in J.B.'s residence and vehicles, and large amounts of currency J.B. was going to pay to his dealer during the transaction that the CI had set up.  One can reasonably infer, based on the information Agent Larsen provided about her training and experience, [id. ¶¶ 1-3], that she knew that all of these circumstances provided probable cause to search Gamory's residence for evidence of illegal narcotics dealing.  See Robinson, 62 F.3d at 1331 ("[O]pinions and conclusions of an experienced agent regarding a set of facts are properly a factor in the probable cause equation for issuing a search warrant.") (internal marks and citations omitted).

defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate." United States v. Maxwell, 920 F.2d 1028, 1034 (D.C. Cir. 1990) (citing Leon, 468 U.S. at 987-88 & Massachusetts v. Sheppard, 468 U.S. 981 (1984)). See also United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003); United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002).

Good faith is an objective standard judged by what a reasonable law enforcement officer would perceive under the circumstances, not a standard judged by a legally trained magistrate or judge. United States v. Taxacher, 902 F.2d 867, 871-72 (11th Cir. 1990) (quoting Leon, 468 U.S. at 918-19). There are four situations where the Leon good faith exception does not apply: (1) where, depending upon the circumstances of the particular case, a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid; (2) where the magistrate in issuing a warrant was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (3) where the issuing magistrate wholly abandoned his judicial role; and (4) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Martin, 297 F.3d at 1313.

Defendants contend that the second situation, that the magistrate judge was

misled by information in the affidavit that the affiant knew was false or would have known was false except for her reckless disregard of the truth, precludes the applicability of the <u>Leon</u> good faith exception. [Doc. 86 at 17]. However, as discussed earlier, there has been no showing that Agent Larsen knew or should have known that the statement in the affidavit that the agents obtained consent from Parker to search the garage was false. Agent Larsen testified that she was informed that agents had obtained consent from Parker to search her apartment and garage, and there is no indication that she had reason to doubt what she was told by her fellow agents. <u>See</u> <u>United States v. Harris</u>, 172 Fed. App. 950, 960 (11th Cir. 2006) (unpublished) ("affidavit was not, based on officer's testimony, knowingly false, nor can it be said that any alleged falsity would have been known absent a reckless disregard of the truth"). Gamory argues that the Court must focus not just on the affiant, but "upon the conduct of all . . . agents involved." [Doc. 86 at 7 (<u>quoting</u> <u>Kirk</u>, 781 F.2d at 1503)]. However, the evidence presented at the evidentiary hearing on Greene's motion concerning the conduct of the officers and Parker on May 24, 2007, does not support a finding that the officers lied to Agent Larsen about gaining voluntary consent from Parker.

## III. <u>CONCLUSION</u>

For the foregoing reasons and cited authority, it is hereby **ORDERED** that Greene's motion to adopt co-defendant's memorandum of law, [Doc. 88], be

**GRANTED**, and that Olvera's motions to suppress, [Docs. 70, 73], be **DENIED** as abandoned. The undersigned Magistrate Judge further **RECOMMENDS** that Gamory's and Greene's motions to suppress, [Docs. 54, 78, 61], be **DENIED**.[30]

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 27th day of February, 2009.

*Russell G. Vineyard*

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[30] Greene's motion for a hearing to determine the admissibility of co-conspirator statements, [Doc. 56], was deferred to the District Court, [Doc. 72].